**Clarence ANNETT and Inez Annett, Appellants,**

v.

**SUNDAY CANYON WATER SUPPLY CORPORATION, Appellee.**

**No. 07–90–0175–CV.**

Court of Appeals of Texas, Amarillo.

Nov. 1, 1991.

Rehearing Overruled Dec. 31, 1991.

---

1. This provision has since been renumbered as 166a(f) pursuant to the 1990 changes in the Texas Rules of Civil Procedure.

Robinson & Fotheringham, Mark D. Tatum, Amarillo, for appellants.

Hinkle Cox Eaton Coffield & Hensley, O.M. Calhoun, Amarillo, for appellee.

Before REYNOLDS, C.J., and BOYD and POFF, JJ.

POFF, Justice.

Appellants Clarence and Inez Annett, hereinafter Annetts, in seventeen points of error complain of the trial court's denial of their petition for a permanent injunction, enjoining the Sunday Canyon Water Supply Corporation, hereinafter SCWSC, from interfering with their right to water service. We will overrule the points of error and affirm the judgment.

1. If the Texas Water Commission issues a certificate that neither the present nor future convenience and necessity will be adversely affected, then service may be discontinued for other reasons. Tex.Water Code Ann. § 13.250(b) (Vernon 1988). In this case, SCWSC never sought to obtain such a certificate.

The seminal point in this appeal requires us to dive into previously unexplored depths of the Texas Water Code (Code). Specifically, we are asked to determine whether a water utility may discontinue service to one of its customers for the customer's failure to install a check valve to protect the system from possible contaminated back flow coming from the customer's line.

### Trouble in Sunday Canyon

Clarence Annett and his mother, Inez Annett, own two lots in Sunday Canyon. One of the lots is unimproved; the other has a house built upon it and received water from SCWSC. The house is not the Annetts' primary residence, but is used on weekends and holidays. Sunday Canyon Water Supply Corporation is a nonprofit corporation authorized by Texas law to supply fresh water to the property owners of Sunday Canyon in Randall County, Texas. SCWSC holds a certificate of public convenience and necessity from the Texas Water Commission for this purpose. The Code denominates SCWSC a "retail public utility." Tex.Water Code Ann. § 13.-002(19) (Vernon Supp.1991). As such, SCWSC is required to render continuous and adequate service to every consumer within its certified area. Id. § 13.250(a) (Vernon 1988 and Supp.1991). A retail public utility may, without Texas Water Commission's permission, discontinue service to part of a certified service area for "(1) nonpayment of charges; (2) nonuse; or (3) other similar reasons in the usual course of business." Code 13.250(b).[1]

In December 1988,[2] SCWSC discontinued the Annetts' water service. The discontinuance was not due to nonpayment or nonuse but rather, due to Clarence and Inez' refusal to install a check valve in the water line on their side of the water meter.[3]

2. The exact day in December was in controversy and never established.

3. I.e., between the water meter and the Annetts' house on the Annetts' property.

SCWSC's water system is designed to furnish water to houses at varying elevations. The water is stored in an above-ground tank at an elevation higher than the highest house. Water flows from the tank to the individual houses by force of gravity alone. If a water line at one of the houses breaks, the water level in the storage tank will fall and decrease the gravity-created pressure in the water system. If the decrease in the system's pressure is great enough, water will re-enter the break in the line and backflow into the water line serving houses below the break in the line. Such a backflow has the potential to contaminate the water supply.

Indeed, during January of 1988 a water line broke at a home in Sunday Canyon, and the water became contaminated. Had the leak not been quickly discovered, a decrease in the system's water pressure would have resulted in the polluted water being drawn back into the water system, thereby contaminating the system.

Concerned about this potentially dangerous situation, SCWSC contacted a representative of the Texas Department of Health, Water Hygiene Division. The Department of Health made SCWSC aware of a health department rule requiring an air gap separation or a mechanical backflow prevention device in situations where an actual or potential contamination of a public drinking water supply system exists.[4] It was suggested that SCWSC could comply with the health department rule and alleviate the potentially dangerous situation by having a check valve (a type of

mechanical backflow prevention device) installed between each individual house and the main water supply.

SCWSC decided to implement this suggestion,[5] and further decided that the utility itself would not undertake the task of installing the check valves. Rather, in February of 1988, SCWSC notified its customers that each property owner would be individually responsible for installing a check valve. The check valves were to be installed on the landowner's property at landowner expense.

In April, SCWSC again notified its customers that they were required to install check valves. The customers were told that they could purchase the valves from SCWSC for $7.71 and that they could install the valves themselves or have them installed. SCWSC volunteered the name of a person who was willing to perform the installations for a fee. The cost of installing the valve was less than $200, including the cost of the valve. Significantly, SCWSC's April notice marked the first time the utility told its customers that failure to install check valves could result in termination of water service. The Annetts were the only customers who refused to install the valve.

The Annetts maintained that the danger of water contamination existed wholly within SCWSC's system and not on the individual properties of Sunday Canyon landowners and, therefore, the responsibility for safeguarding against the perceived danger fell upon SCWSC and not upon its customers. The Annetts were fully cogni-

---

4. Tex.Dep't of Health, 25 Tex.Admin.Code § 337.206(g)(1) (West Oct. 14, 1988) (Water Distribution). The full text of this provision reads as follows:

(g) Backflow, siphonage.
(1) No water connection from any public drinking water supply system shall be made to any establishment where an actual or potential contamination or system hazard exist [sic] without an air gap separation between the drinking water supply and the source of potential contamination. The containment air gap is sometimes impractical and, instead, reliance must be placed on individual "internal" air gaps or mechanical backflow prevention devices. Under these conditions, additional protection shall be required at the me-

ter in the form of a backflow prevention device (in accordance with AWWA Standard C506, latest revision, and AWWA Manual M14) on those establishments handling substances deleterious or hazardous to the public health. The water purveyor need not require backflow protection at the water service entrance if an adequate cross-connection control program is in effect that includes an annual inspection and testing by a certified backflow prevention device tester. It will be the responsibility of the water purveyor to insure that these requirements are met.

5. The Texas Department of Health, Water Hygiene Division, did not order SCWSC to have check valves installed.

zant of the fact that their refusal to install a check valve would result in interruption of water service. SCWSC sent the Annetts several notices that their water service would be terminated if a check valve was not installed. The original deadline for compliance with the SCWSC requirement was September 1, 1988. The deadline was later extended to October 1. SCWSC finally discontinued water service to the Annetts' property in December 1988.

In response to the termination of their water service, the Annetts filed suit against SCWSC in the Randall County Court at Law. They sought a temporary restraining order, a temporary injunction and a permanent injunction, enjoining SCWSC from interfering with the supply of fresh water to their property. Additionally, the Annetts sought general damages for the loss of use of their property and special damages for deterioration of their septic tank, water heater and other plumbing equipment due to the termination of water service. The Annetts also claimed to be entitled to an award of punitive damages because SCWSC had acted with malice in discontinuing their water service.

The trial court did not act on the Annetts' request for a temporary restraining order. Instead, the trial court held a hearing on the Annetts' request for a temporary injunction. The court denied the request. The case proceeded to trial before the court on the petition for a permanent injunction in January of 1990. The trial court denied the Annetts' request for a permanent injunction and all other relief sought by the Annetts. In seventeen points of error, the Annetts appeal the trial court's judgment.

When condensed, the Annetts' seventeen points of error assert that the trial court

erred in reaching the following four conclusions: (1) SCWSC was entitled to discontinue the Annetts' water service; [6] (2) the Annetts were not entitled to a permanent injunction enjoining SCWSC from interfering with their water supply; [7] (3) the Annetts suffered no damages; [8] and (4) SCWSC did not act with malice toward the Annetts and therefore punitive damages were not warranted. [9]

*Proper Termination of Service?*

As previously mentioned, a retail public utility such as SCWSC is allowed to discontinue a customer's water service without the prior approval of the Texas Water Commission for the following three reasons: "(1) nonpayment of charges; (2) nonuse; or (3) other similar reasons in the usual course of business." [10] Additionally, a water utility is expressly authorized to disconnect a customer's water service if that customer violates the utility's rules regarding the use of the service in a manner that interferes with the water service of other customers. Tex.Water Comm'n, 31 Tex.Admin.Code § 291.87(b)(2) (West April 1, 1991) (Discontinuance of Service). We must determine whether SCWSC was entitled to disconnect the Annetts' water service pursuant to either or both of the foregoing provisions.

■ Water purveyors are responsible for ensuring that no connection is made between a drinking water supply and an establishment where a potential contamination hazard exists unless there is an air gap separation or a mechanical backflow prevention device between the water supply and the source of potential contamination. Tex.Dep't of Health, 25 Tex.Admin.Code § 337.206(g)(1) (West Oct. 14, 1988) (Water

6. Points of error 1, 2, 3, 4, 5, 9, 11, 12 and 14.

7. Points of error 10 and 13.

8. Points of error 6, 7, 15 and 17.

9. Points of error 8 and 16.

10. *Tex.Water Code* Ann. § 13.250(b) (Vernon 1988). The full text of this provision reads as follows:

(b) Unless the commission issues a certificate that neither the present nor future convenience and necessity will be adversely affected, the holder of a certificate shall not discontinue, reduce, or impair service to a certified service area or part of a certified service area except for:
(1) nonpayment of charge;
(2) nonuse; or
(3) other similar reasons in the usual course of business.

Distribution).[11] However, while the water purveyor is responsible for ensuring that no connection is made, it is not responsible for installing backflow prevention devices at each individual establishment where a possibility of contamination exists. Section 337.206(g)(1) clearly states that if an adequate cross-connection control program is in effect, "[t]he water purveyor need not require backflow protection." Read conversely, a water purveyor may, in the absence of a cross-connection control program, require its customers to provide backflow protection. We read section 337.-206(g)(1) to grant to the water supplier, SCWSC, the option to either maintain a cross-connection program or require backflow protection. Thus, SCWSC acted properly in placing the responsibility for installing check valves on its customers. Our question now becomes whether SCWSC was justified in discontinuing the Annetts' water service because of the Annetts' failure to comply with SCWSC's wholly proper requirement that each customer install a check valve.

■ The facts of this case clearly show that if check valves are not installed, the Sunday Canyon water system is in very real danger of contamination. The Annetts' refusal to install a check valve is most certainly a violation of a proper SCWSC rule. Such violation interferes with the water service of other customers by creating a danger of contamination to the entire water system. Therefore, we find that SCWSC was justified in discontinuing the Annetts' water service under Tex.Water Comm'n, 31 Tex.Admin.Code § 291.87(b)(2) (West April 1, 1991) (Discontinuance of Service).

Additionally, we find that even notwithstanding the Texas Water Commission's promulgation of the above-cited provision, a customer's violation of a utility rule regarding the use of water service in a manner that interferes with the water service of other customers may be a basis for discontinuance of service under Tex.Water Code Ann. § 13.250(b)(3) (Vernon 1988). SCWSC, in its usual course of business,

had a duty to provide its customers with clean, pure water and it had a right to establish reasonable rules and regulations to maintain and protect its water system. Thus, SCWSC was justified in disconnecting the Annetts' water service under both of the above-referenced provisions.

*Summary*

Our finding that SCWSC was justified in terminating water service to the Annetts requires that we overrule points of error 1, 2, 3, 4, 5, 9, 11, 12 and 19 and obviates discussion of the Annetts' remaining points of error. The judgment of the trial court is affirmed.

---

11. This provision is set forth in its entirety in footnote 2 of this opinion.